UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ANGELA WELCH, as Chapter 7
Trustee for the bankruptcy
estate of Frank Michael
Mongelluzzi,

   Plaintiff,

v.         Case No. 8:14-cv-187-T-33AEP

SYNOVUS BANK,

   Defendant.
_____/

## ORDER

  This matter comes before the Court in consideration of Defendant Synovus Bank's Motion to Dismiss Complaint (Doc. # 18), filed on March 4, 2014.  Plaintiff Angela Welch, Chapter 7 Trustee for the bankruptcy estate of Frank Michael Mongelluzzi (Trustee), filed a response in opposition to the Motion on April 4, 2014.  (Doc. # 25).  With leave of Court, Synovus filed a reply to the Trustee's response (Doc. # 29) on April 18, 2014, and the Trustee filed a surreply (Doc. # 37) on May 2, 2014.  For the reasons that follow, the Motion is denied.

**I. Allegations of the Amended Complaint[1]**

_____

[1] The Trustee filed an Amended Complaint on February 24, 2014, in response to an Order of the Court directing the Trustee to

A.   **Factual Background**

From 1986 to 2010, Frank Mongelluzzi and his wife Anne
Mongelluzzi owned and operated several temporary labor
staffing companies to which the Amended Complaint refers
collectively as the "Able Body Labor Businesses." (Doc. # 17
at ¶¶ 7-8).  The Able Body Labor Businesses were headquartered
in Clearwater, Florida, had 170 office locations in 25 states,
and generated over $200 million in annual revenues between
2004 and 2009.  (Id. at ¶ 9).  In addition to these staffing
companies, the Mongelluzzis maintained various other personal
and business interests, including ownership of restaurants,
construction companies, pawn shops, residential and
commercial real estate holdings, aircraft, and yachts.  (Id.
at ¶ 11).  According to the Trustee, these "Non-Staffing
Businesses were not financially self-sufficient but, rather,
relied heavily upon the Able Body Labor Businesses' revenue,
loan proceeds, and illicit banking activities."  (Id. at ¶
12).

The Mongelluzzis and their related business entities
maintained "314 bank accounts at approximately 38 financial
institutions . . . , including 77 bank accounts at Synovus .

_____

cure certain defective jurisdictional allegations. (See Doc.
# 15; Doc. # 17).

. . in the period 2007 through 2011." (Id. at ¶ 13). Between March 2008 and September 2010, the Able Body Labor Businesses also had a $35 million asset based revolving line of credit with Synovus (the "Synovus Revolver") which was personally guaranteed by the Mongelluzzis. (Id. at ¶ 18). The Synovus Revolver "was a vital mechanism for funding the Able Body Labor Businesses' daily working capital needs including the payment of legitimate creditor claims." (Id. at ¶ 19). The Mongelluzzis and their related business entities also had several real estate, equipment, and other loans with Synovus. (Id. at ¶ 20).

In connection with the administration of the Synovus Revolver and other loans to the Mongelluzzis, Synovus "engaged in rigorous financial oversight of the Mongelluzzis and the[ir] Business Entities by, among other things, (a) conducting an ongoing review of the obligors' operations, performance and prospects; (b) conducting an ongoing review of the obligors' financial statements, assets and liabilities; and (c) performing detailed analysis, examinations and audits of advances, use of loan proceeds, and collateral." (Id. at ¶ 21).

The Trustee asserts that, "[i]n order to support the operations of the Business Entities, [Frank] Mongelluzzi and

others devised and implemented a massive check kiting scheme"
using the numerous bank accounts maintained by the
Mongelluzzis and related business entities. (Id. at ¶ 23).
This scheme allegedly included the Synovus accounts. (Id.).

The Amended Complaint describes the check kiting scheme
as follows:

> Basically, [Frank] Mongelluzzi and others
> continuously issued checks drawn on accounts which
> lacked sufficient available funds to cover them
> (the "Check Kite Accounts") so that they would have
> access to interest free loans of the fictitious
> account balances during the float period and
> thereby hinder and/or delay [Frank] Mongelluzzi's
> and the Business Entities' creditors in the period
> 2007 through 2010.
>   In order to provide cover for their massive
> check kiting scheme, [Frank] Mongelluzzi and others
> would then continuously write checks drawn on the
> accounts of their other affiliated entities (or
> transfer loan proceeds from the Synovus Revolver)
> and deposit those checks (or loan proceeds) to the
> Check Kite Accounts before the float period expired
> so that the checks would not bounce and thereby
> cause the revelation and cessation of the scheme.

(Id. at ¶¶ 24-25).

The Trustee alleges that "the loan documents for the
Synovus Revolver restricted use of the loan proceeds to the
obligors' working capital needs." (Id. at ¶ 28). "However,
Synovus became aware in the period from 2007 through 2010
that [Frank] Mongelluzzi and others systematically
transferred loan proceeds from the Synovus Revolver without

any apparent justification to and between non-obligor
Business Entities and to cover checks issued in connection
with the check kiting scheme in violation of the loan
covenants and restrictions." (Id. at ¶ 29). Additionally,
the Trustee alleges that Synovus "became aware in the period
2007 through 2010 that [Frank] Mongelluzzi and others were
also making payments on the Synovus Revolver with loan
proceeds originating from the Synovus Revolver, with loan
proceeds obtained from other financial institutions, and with
cash." (Id. at ¶ 30).

     The Trustee asserts that "Synovus' actual knowledge of
[Frank] Mongelluzzi's intent to hinder and/or delay creditors
is evidenced by significant circumstantial evidence,"
including Frank Mongelluzzi's or the related business
entities':

> (a)  pattern of writing checks on accounts without
>       sufficient available balances to cover them
>       followed by transfers of funds from accounts
>       of other affiliated entities and use of loan
>       proceeds from the Synovus Revolver in order to
>       cover such checks before the float period
>       expired;
>
> (b)  chronically overdrawn accounts;
>
> (c)  transfer of loan proceeds with no apparent
>       justification to bank accounts of non-obligor
>       affiliated entities which did not appear to
>       have legitimate operations or sources of
>       revenue;

    (d)  repayment of the Synovus Revolver with loan proceeds from other financial institutions;

    (e)  nominal cash on hand in relation to existing financial obligations;

    (f)  cash flow issues;

    (g)  overly leveraged financial condition;

    (h)  numerous cash withdrawals of $10,000 each by Professional Staffing – A.B.T.S., Inc., in the period March 27, 2009 through April 16, 2010;

    (i)  evasion of single entity borrowing limits by permitting the Mongezzullis to obtain loans for shell entities which did not appear to have legitimate operations or sources of revenues;

    (j)  material discrepancies and ambiguities in financial reports;

    (k)  collateral defects and/or deficiencies; and

    (l)  material loan defaults.

(Id. at ¶ 32). The Trustee alleges that Synovus continued its banking relationship with the Mongelluzzis and their related business entities despite this circumstantial evidence "so that it could continue to collect substantial fees, charges, interest, and other forms of revenue to the exclusion and detriment of [Frank] Mongelluzzi's and the Business Entitites' legitimate creditors." (Id. at ¶ 33).

Synovus allegedly emailed the Mongelluzzis and others in July of 2010, explaining that, between the existing loan

balance and overdraft conditions, the Mongelluzzis had "pushed the bank to $45 million dollars in outstanding debt for company payroll, insurance and operations." (<u>Id.</u> at ¶ 35(b)). Synovus further advised within the email that "[t]he overdrafts represent an illegal action of writing checks without funds to cover them." (<u>Id.</u>).

The Trustee alleges that, "[r]ather than bringing these activities to an immediate halt, . . . Synovus implemented a controlled exit strategy to obtain repayment of the Mongelluzzis and the Business Entities' outstanding obligations irrespective of the source of payment and to preserve future revenue through a forced sale of the Able Body Labor Businesses and establishment of a similar banking relationship with the purchaser." (<u>Id.</u> at ¶ 38).

The alleged check kiting scheme collapsed in the summer of 2010 when several financial institutions closed or froze many of the subject bank accounts and refused to honor checks drawn thereon. (<u>Id.</u> at ¶ 39). In response to this turn of events, Synovus took certain actions against the Mongelluzzis and the related business entities, including refusing to process future advances from the Synovus Revolver, refusing to process outgoing wires, closing or disabling eight corporate accounts, and requiring a pledge of the stock of

7

eighteen of the related business entities in order to collateralize the previously extended general unsecured overdraft loans. (Id. at ¶ 42). However, Synovus allegedly continued to receive substantial transfers from Frank Mongelluzzi and the related business entities "after it obtained knowledge" of Frank Mongelluzzi's insolvency and the alleged check kiting scheme. (Id. at ¶ 44).

Synovus subsequently "exerted substantial pressure on the Mongelluzzis to sell the Able Body Labor Businesses and was actively involved in negotiations for, and the structure of, the ultimate sale of their assets to Michael D. Traina and MDT Personnel, LLC on or about September 2, 2010." (Id. at ¶ 45). The Amended Complaint explains that "the Mongelluzzis, the Able Body Labor Businesses, Traina, and MDT executed and purportedly closed [an asset purchase agreement] providing for the sale of the Able Body Labor Businesses' assets to Traina and MDT in exchange for a purchase price equivalent to the then current outstanding senior indebtedness of the Able Body Labor Businesses."[2] (Id. at ¶

---

[2] The Trustee alleges that Traina and MDT executed a side agreement with the Mongelluzzis pursuant to which they agreed to pay the Mongelluzzis 50% of the net proceeds of a sale of substantially all of the assets or equity interests of MDT to a third party, among other provisions. (Doc. # 17 at ¶ 51). However, the Trustee alleges that "Traina and MDT repudiated

53).  The Trustee characterizes the effect of this asset sale

as follows:

> In connection with the closing of the Able
> Body Labor Asset Sale, the Synovus Revolver to the
> Able Body Labor Businesses and which was secured by
> their assets, was re-structured and became the
> obligation of MDT and secured by the assets MDT
> acquired from the Able Body Labor Businesses (the
> "Synovus MDT Revolver").
>
> In other words, Synovus had essentially the
> same loan and the very same collateral both before
> and after the Mongelluzzis sold the Able Body Labor
> Businesses' assets to Traina and MDT, with the
> exception of new obligors – MDT and Traina.
>
> Synovus then advanced proceeds of the Synovus
> MDT Revolver into MDT's bank account(s) at the Bank
> and MDT nearly simultaneously disbursed the loan
> proceeds from such account(s) back to Synovus in
> order to satisfy the Synovus Revolver and certain
> other loans.
>
> [Thus,] F[rank] Mongelluzzi's sale of the Able
> Body Labor Businesses' assets to Traina and MDT on
> or about September 2, 2010, constituted a transfer
> of interest of [Frank] Mongelluzzi in property
> within the meaning of Chapter 726 of the Florida
> Statutes . . . made to or for the benefit of Synovus
> as the only party which received the purchase price
> consideration totaling approximately $42 million
> from the transaction.

(Id. at ¶¶ 57-60).

After the sale of the Able Body Labor Businesses' assets,

"the Able Body Labor Businesses became shell corporations

with no ability to satisfy the claims of their legitimate

---

all of their obligations to the Mongelluzzis" under the side
agreement shortly after the sale of the Able Body Labor
Businesses' assets.  (Id. at ¶ 61).

creditors and were administratively dissolved . . . ." (Id. at ¶ 63). On May 24, 2013, the Trustee filed numerous voluntary bankruptcy petitions in the U.S. Bankruptcy Court for the Middle District of Florida involving the Able Body Labor Businesses as well as several of the Mongelluzzis' non-staffing businesses. (Id. at ¶ 64). "As of October 9, 2013, 167 proofs of claim in the aggregate amount of $86,143,353.81 have been filed in the Able Body Labor Bankruptcy Cases and 64 proofs of claim in the aggregate amount of $37,893,372.01 have been filed in the Non-Staffing Businesses Bankruptcy Cases." (Id. at ¶ 65).

Frank Mongelluzzi commenced his personal bankruptcy case on February 2, 2011. (Id. at ¶ 66). "As of October 1, 2013, 146 proofs of claim in the aggregate amount of $108,262,532.87 have been filed in [Frank] Mongelluzzi's personal Bankruptcy Case." (Id. at ¶ 67).

On February 4, 2013, the assets of the Able Body Labor Businesses were sold again. (Id. at ¶ 68). This time, the assets were sold to "TrueBlue, Inc. and/or Labor Ready Holdings, Inc.," for over $48 million. (Id. at ¶ 68). No proceeds from this sale were paid to the Mongelluzzis, the shell corporations which formerly owned and operated the Able

Body Labor Businesses' assets, or their known creditors.  (Id. at ¶ 71).

   **B.    The Trustee's Claims**

   The Trustee's claims focus on four different categories of transfers conducted within the four-year period preceding the commencement date of Frank Mongelluzzi's personal bankruptcy proceedings.  First, the Trustee claims that "Synovus intended the negative cash balances in [Frank] Mongelluzzi's bank accounts to constitute loans for which the bank perceived a credit risk."  (Id. at ¶ 72).  Thus, the Trustee alleges that Frank Mongelluzzi's transfers to Synovus to repay overdraft loans totaling $1,981,211.73 (the "Overdraft Loan Repayment Transfers") constituted transfers of an interest in property within the meaning of Chapter 726, Florida Statutes, which makes the Overdraft Loan Repayment Transfers "partially or entirely subject to avoidance and recovery by the Plaintiff for the benefit of [Frank] Mongelluzzi's legitimate creditors."  (Id.).  The Trustee has attached as an exhibit to the Amended Complaint a schedule of the relevant overdraft and repayment dates.  (Id. at 66-67).

   Second, the Trustee claims that "[Frank] Mongelluzzi caused $17,434,562.80 to be deposited into his Synovus bank accounts (the 'Deposit Transfers')."  (Id. at ¶ 73).  The

11

Trustee claims that the Deposit Transfers, like the Overdraft Loan Repayment Transfers, are subject to avoidance and recovery for the benefit of Frank Mongelluzzi's "legitimate creditors." (Id.). The Trustee has attached as an exhibit to the Amended Complaint a schedule of the Deposit Transfers. (Id. at 69-70).

Third, the Trustee alleges that, during the relevant time period, Synovus "obtained dominion and control over transfers made to repay [Frank] Mongelluzzi's outstanding loan obligations in the amount of $5,145,963.37 (the 'Other Loan Repayment Transfers')," which the Trustee states are subject to avoidance and recovery as well. (Id. at ¶ 74). The Trustee has attached as an exhibit to the Amended Complaint a schedule of the Other Loan Repayment Transfers. (Id. at 72-73).

Lastly, the Trustee's claims focus on the transfers related to the Able Body Labor asset sale. (Id. at ¶ 75). According to the Trustee, these transfers too are subject to avoidance and recovery either partially or in their entirety. (Id.).

The Trustee thus asserts the following twelve counts, each entitled "Avoidance and Recovery of Fraudulent Transfers," against Synovus: (1) Actual Fraud, 11 U.S.C. §

544(b) and Florida Statute §§ 726.105(1)(a) – Overdraft Loan
Repayment Transfers; (2) Constructive Fraud, 11 U.S.C. §
544(b) and Florida Statute §§ 726.105(1)(b) and 726.108 –
Overdraft Loan Repayment Transfers; (3) Constructive Fraud,
11 U.S.C. § 544(b) and Florida Statute §§ 726.106(1) and
726.108 – Overdraft Loan Repayment Transfers; (4) Actual
Fraud, 11 U.S.C. § 544(b) and Florida Statute §§ 726.105(1)(a)
and 726.108 – Deposit Transfers; (5) Constructive Fraud, 11
U.S.C. § 544(b) and Florida Statute §§ 726.106(1) and 726.108
– Deposit Transfers; (6) Constructive Fraud, 11 U.S.C. §
544(b), Florida Statute §§ 726.106(1) and 726.108 – Deposit
Transfers; (7) Actual Fraud, 11 U.S.C. § 544 and Florida
Statute §§ 726.105(1)(a) and 726.108 – Other Loan Repayment
Transfers; (8) Constructive Fraud, 11 U.S.C. § 544 and Florida
Statute §§ 726.105(1)(b) and 726.108 – Other Loan Repayment
Transfers; (9) Constructive Fraud, 11 U.S.C. § 544(b) and
Florida Statute §§ 726.106(1) and 726.108 – Other Loan
Repayment Transfers; (10) Actual Fraud, 11 U.S.C. § 544 and
Florida Statute §§ 726.105(1)(a) and 726.108 – Able Body Labor
Asset Sale Transfers; (11) Constructive Fraud, 11 U.S.C. §
544 and Florida Statute §§ 726.105(1)(b) and 726.108 – Able
Body Labor Asset Sale Transfers; and (12) Constructive Fraud,
11 U.S.C. § 544(b) and Florida Statute §§ 726.106(1) and

726.108 – Able Body Labor Asset Sale Transfers.  (Doc. # 17 at 3-4).[3]

Presently before the Court is Synovus's Motion to Dismiss Complaint (Doc. # 18), which seeks dismissal with prejudice of the Trustee's Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6), 12(b)(7), and 19. The Court has reviewed the Motion, as well as the Trustee's response in opposition thereto (Doc. # 25), Synovus's reply (Doc. # 29), and the Trustee's surreply (Doc. # 37), and is otherwise fully advised in the premises.

## II.  **Rule 12(b)(6) Motion to Dismiss**

### A.  **Legal Standard**

In reviewing a motion to dismiss for failure to state a claim, a trial court accepts as true all factual allegations in the complaint and construes the facts in the light most favorable to the plaintiff.  Jackson v. Bellsouth Telecomms., 372 F.3d 1250, 1262 (11th Cir. 2004).  However, courts are not "bound to accept as true a legal conclusion couched as a factual allegation."  Papasan v. Allain, 478 U.S. 265, 286

---

[3] On May 7, 2014, this Court entered an Order directing the parties to show cause as to why this action should not be referred to the United States Bankruptcy Court for all further proceedings in accordance with 28 U.S.C. § 157.  (Doc. # 39). Both parties filed a response opposing the reference of this case to the Bankruptcy Court.  (Doc. ## 40, 41).

14

(1986).

In <u>Bell Atlantic Corp. v. Twombly</u>, the Supreme Court articulated the standard by which claims should be evaluated on a motion to dismiss:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level.

550 U.S. 544, 555 (2007) (internal citations omitted).

In accordance with <u>Twombly</u>, Federal Rule of Civil Procedure 8(a) calls "for sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 663 (2009) (quoting <u>Twombly</u>, 550 U.S. at 570).  A plausible claim for relief must include "factual content [that] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Id.</u>

Additionally, a pleading that contains an allegation of fraud is subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b).  Rule 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or

mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

B. **Discussion**

Synovus raises copious arguments in favor of dismissing each of the Trustee's twelve Counts. The Court will address each of these arguments in turn. As a preliminary matter, however, the Court will address the parties' disagreement as to whether the Amended Complaint must satisfy the heightened pleading standard of Rule 9(b).

Synovus argues that Rule 9(b) "should apply to the fraudulent transfer actions" alleged by the Trustee, and that, "[i]n fraud-based actions like this one, allegations made upon information and belief are generally insufficient." (Doc. # 18 at 5). The Trustee argues, however, that its claims against Synovus "are not premised on allegations of fraud," but rather upon allegations "that [Frank] Mongelluzzi made the subject transfers to the Defendant in an effort to hinder or delay his creditors." (Doc. # 25 at 14). Furthermore, to the extent Rule 9(b) does apply in this case, the Trustee argues that "Courts routinely relax Rule 9(b)'s particularity requirement when the plaintiff is a bankruptcy trustee." (Id.).

The Court declines to generalize as to whether fraudulent transfer claims of the variety raised in this case call for application of Rule 9(b).  Instead, the Court finds that, even if Rule 9(b) applies in this case, the Trustee has complied with its particularity requirement.  The Amended Complaint spans 47 pages and presents its allegations in 137 numbered paragraphs, including many paragraphs detailing the factual circumstances surrounding Frank Mongelluzzi's use of Synovus bank accounts.  (See generally Doc. # 17).  Additionally, the Trustee has attached to the Amended Complaint a number of illustrations analyzing the alleged check kiting activity as well as several documents detailing Frank Mongelluzzi's deposits and overdraft activity.  (Id. at 51-75).  After carefully reviewing the allegations and attachments, the Court finds the factual matter alleged sufficient to withstand a Rule 12(b)(6) challenge under either the pleading standards of Rule 8(a) or 9(b).

The Court finds this conclusion especially suitable in light of the "relaxed" Rule 9(b) standard applicable to a case in which the plaintiff is a trustee in bankruptcy.  See Profilet v. Cambridge Fin. Corp., 231 B.R. 373, 379 (S.D. Fla. 1999) ("[T]he Trustee argues – and the Court agrees – that courts should relax the specificity requirements where

17

the plaintiff is a trustee in bankruptcy."); <u>In re Pearlman</u>, 478 B.R. 448, 453 n.7 (M.D. Fla. 2012) ("Some of the policy reasons for Rule 9(b)'s particularity requirement certainly are lessened in fraudulent transfer claims, where the defendant transferee is not the party accused of fraud. Moreover, even courts that find Rule 9(b) applicable often 'relax' the 9(b) requirements where fraudulent transfer claims are brought by 'outsiders' – such as bankruptcy trustees – who have limited information regarding fraud."). The Court additionally notes that Synovus "has not argued with any vigor that the particularity requirement of Federal Rule of Civil Procedure 9(b) is the problem with the [Amended Complaint]," instead focusing on more substantive arguments for dismissal of each particular Count.  <u>In re Pearlman</u>, 478 B.R. at 453 n.7.

Accordingly, even assuming that the heightened pleading requirements of Rule 9(b) apply here, the Court finds the factual allegations relating to fraudulent transfers in the Amended Complaint sufficient to satisfy the Trustee's pleading obligations.

     1.   **<u>Counts I, IV and VII</u>**

          a.   **<u>Sufficiency of the Check-Kiting Allegations</u>**

As characterized by Synovus, Counts I, IV and VII seek "to recover assets that [the Trustee] alleges [Frank] Mongelluzzi transferred to Synovus with the actual intent to hinder or delay his creditors." (Doc. # 18 at 6). The Trustee brings these Counts pursuant to 11 U.S.C. § 544 and Section 726.105(1)(a), Florida Statutes. (See Doc. # 17 at 3-4).

Section 726.105(1), Florida Statutes, provides as follows:

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

1. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

2. Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

"Under [11 U.S.C. §] 544(b), the Trustee 'step[s] into the shoes of a creditor for the purpose of asserting causes of action under state fraudulent conveyance laws,'" and the statute "'confers on the trustee the status of a hypothetical creditor or bona fide purchaser as of the commencement of the case.'"   In re McCarn's Allstate Fin., Inc., 326 B.R. 843, 849, (Bankr. M.D. Fla. 2005) (quoting Matter of Zedda, 103 F.3d 1195, 1201 (5th Cir. 1997)).[4]

### i.   Intent

In the present Motion, Synovus argues that the "alleged kite," which is "the central lynchpin of the Complaint . . . is faulty because it lacks legal foundation and provides no factual support of an intent by [Frank] Mongelluzzi to defraud his creditors."  (Doc. # 18 at 6).  Synovus explains that "a check kite[,] unlike a Ponzi scheme[,] does not necessarily

---

[4] The Trustee lists 11 U.S.C. § 544 separately within each Count as a basis for each individual claim.  Similarly, each Count references Fla. Stat. § 726.108, which states in relevant part:

> (1) In an action for relief against a transfer or obligation under §§ 726.101-726.112, a creditor .
> . . may obtain:
> (a) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;
> . . . .

Fla. Stat. § 726.108(1)(a).

carry an intent to defraud creditors.  Therefore, allegations

of a check kite are insufficient to state a claim." (Id.).

More specifically, Synovus argues:

> Fraudulent intent must be shown by acts beyond
> those taken to implement an alleged kite because
> courts recognize that, without more, it is not
> inherently fraudulent to: (a) capitalize on a 1- to
> 2-day bank processing time, (b) write checks that
> are not yet supported by an account balance, and
> (c) even deposit a check known to be unsupported by
> sufficient funds.

(Id. at 7) (citing Brewster v. McNeil, 720 F. Supp. 2d 1369,

1371-72 (S.D. Fla. 2009)).

"Given the difficulties in establishing a transferor's

actual intent, courts generally look at the totality of the

circumstances and the badges of fraud surrounding the

transfers." In re World Vision Ent'mt, Inc., 275 B.R. 641,

656 (Bankr. M.D. Fla. 2002).  The Amended Complaint alleges:

> [Frank] Mongelluzzi's actual intent to hinder
> and/or delay his creditors was supported by the
> presence of a number of badges of fraud including,
> but not limited to, (i) his insolvency; (ii) the
> check kiting scheme; (iii) his inability to pay
> debts as they arose in the ordinary course of
> business; (iv) his having been threatened with, or
> subjected to, lawsuits before the transfers were
> made; (v) his removal and/or concealment of assets;
> and (vi) his incurrence of substantial debt shortly
> before or shortly after the transfers to Synovus .
> . . were made.

(Doc. # 17 at ¶ 37).  Thus, the Trustee does not rely upon

any presumption of fraud accompanying the alleged check

kiting scheme to satisfy the element of intent in her
pleading.   The Court accordingly finds that the Amended
Complaint contains sufficient factual allegations regarding
Frank Mongelluzzi's intent to survive Synovus's Motion to
Dismiss on this issue.   Any argument as to whether these
purported "badges of fraud" will support, in consideration of
the totality of the circumstances, Frank Mongelluzzi's intent
in this case such that the Trustee may prevail on these claims
is not properly before the Court at this juncture.   Synovus
will have the opportunity to challenge the Trustee's
contentions in this regard at the summary judgment stage.

### ii. Transfers Categorically Not Fraudulent

Next, Synovus argues that "the Uniform Commercial Code
(UCC) and case precedent establish as a matter of law th[at]
Repayments and Deposits cannot support a fraudulent transfer,
even in a kite." (Doc. # 18 at 6) (citing Pioneer Liquidating
Corp. v. San Diego Trust & Savings Bank, 211 B.R. 704 (S.D.
Cal. 1997)(Pioneer I), aff'd in part, 166 F.3d 342 (9th Cir.
1999) (Pioneer II)).   Synovus also provides an assortment of
non-binding precedent to support the contention that "case
law establishes that repayments to secured creditors with
sufficient collateral cannot as a matter of law be fraudulent

transfers." (<u>Id.</u> at 9) (citing <u>Austin v. Chisick</u>, 298 B.R. 652, 665-66 (C.D. Cal. 2003); <u>Henry v. Lehman Comm. Paper, Inc.</u>, 471 F.3d 977, 1007-09 (9th Cir. 2006); <u>The Unencumbered Assets Trust v. JP Morgan Chase Bank</u>, 783 F. Supp. 2d 1003, 1029-31 (S.D. Ohio 2011)).

In response, the Trustee counters that Synovus's "reliance on the <u>Pioneer</u> decisions, which have never been cited by any federal or state court in Florida in the nearly two decades since they were decided, is misplaced and contravenes well-settled Eleventh Circuit jurisprudence." (Doc. # 25 at 17). To the extent the <u>Pioneer</u> cases may apply here, the Trustee argues that "those cases do not create absolute shields for banks in fraudulent transfer cases." (<u>Id.</u>).

The Court agrees and declines to find at this early stage of the proceedings that the reasoning of <u>Pioneer</u> mandates dismissal of the Trustee's claims against Synovus. Neither <u>Pioneer I</u> nor <u>Pioneer II</u> addresses the applicability of its holding to a motion to dismiss, as the district court in that case had the benefit of evaluating each party's evidence over the course of a full trial before resolving the parties' motions for judgment as a matter of law. <u>See Pioneer I</u>, 211 B.R. at 709. Furthermore, as previously noted, neither

Pioneer case is binding on this Court.  The Court declines at this early juncture to evaluate whether it might be appropriate to apply the Ninth Circuit's holdings to the facts of this case.[5]

Synovus additionally cites a Florida case, Jacksonville Bulls Football, Limited v. Blatt, 535 So. 2d 626, 628-30 (Fla. 3d DCA 1988), for the proposition that "judicial precedent establishes payments to creditors such as the Repayments to Synovus cannot be fraudulent transfers under Florida law." (Doc. # 18 at 9).  In its reply, Synovus additionally cites Sunshine Resources, Inc. v. Simpson, 763 So. 2d 1078, 1081 (Fla. 4th DCA 1999) and In re Bifani, No. 8:13-cv-2197-JDW, 2014 WL 272920 (M.D. Fla. Jan. 23, 2014) to support its

_____

[5] Additionally, to the extent Synovus invokes the Pioneer cases to argue that "a bank upon receipt of a check for deposit is a mere conduit and never has dominion or control over the deposited funds," (Doc. # 18 at 8), the Court agrees with the Trustee that Synovus's "entitlement to the mere conduit exception to transferee liability . . . presents a highly factual issue which is not properly resolvable on a motion to dismiss" (Doc. # 25 at 17).  See In re Harwell, 628 F.3d 1312, 1324 (11th Cir. 2010) (explaining that "[m]ere conduits, such as lawyers and banks, do not have an affirmative duty to investigate the underlying actions or intentions of the transferor," but finding that a question of fact precluded summary judgment based on the mere conduit test under the circumstances of the case).  However, Synovus appears to concede in its reply that "the defense[s] of mere conduit and good faith are not in play at this time." (Doc. # 29 at 1-2).

argument that a payment to a creditor should not constitute
a fraudulent transfer.

However, the Court finds that Synovus has overstated the
applicability of these holdings to the present case.   The
Court in In re Bifani aptly explained the limitations on the
holding in Jacksonville Bulls as follows:

> LaMarca next argues that her status as a creditor
> of the Estate negates any intent to defraud.   In
> support of that broad conclusion, she cites
> Jacksonville Bulls Football, Ltd. v. Blatt, 535 So.
> 2d 626, 628-30 (Fla. 3d DCA 1988).   Jacksonville
> Bulls does not stand for the proposition for which
> LaMarca cites it.   Rather, it held:
>
> [I]f a judgment debtor disposes of assets for
> adequate cash, the transaction will not be
> considered fraudulent in the absence of a showing
> that the debtor intended to give the funds received
> to other than existing creditors.   Otherwise
> stated, it is not fraudulent to give the funds to
> some but not all existing creditors, even though
> the effect might be to injure or prejudice an
> existing creditor who was not chosen to receive the
> debtor's largesse.   Id. at 629.   Such transfers are
> called "preferential transfers," and they are not
> fraudulent.   Id.
>
> The transfer of the . . . property from Bifani to
> LaMarca, however, was not a "preferential
> transfer."   There is no evidence that Bifani
> received above-market compensation for the property
> and used the income to selectively compensate
> LaMarca as a creditor, as in Jacksonville Bulls.

In re Bifani, 2014 WL 272920, at *5.   Accordingly, the
determination of whether the transfers in this case indeed
constitute the sort of transfers to a creditor which would

belie any finding of fraud requires this Court to look beyond the pleadings – an option unavailable to the Court on the present Motion to Dismiss.  Because Synovus has not convinced the Court that the cases cited require dismissal of a fraudulent transfer claim against a bank at the motion to dismiss stage, the Court declines to dismiss Counts I, IV and VII on these grounds.

### iii. <u>A "Real Kite"</u>

Next, Synovus claims that "the Complaint fails to allege a real kite."  (Doc. # 18 at 10).  Synovus supports this argument with the following explanation:

> In paragraphs 25 and 26, the Trustee refers to a "massive check kiting scheme" and purports to provide eight specific illustrations of how it worked.  But the illustrations suggest there was no check kiting scheme.  Illustrations 1-3 and 5-7 show checks were paid by banks on the same day the accounts were credited by way of settled deposits to cover the checks.  In example 4, again deposits were made to cover checks cleared on the same day; the bank statement, Exhibit 4, shows the account was overdrawn with a beginning balance of ($28,742.39) and ended up with an overdrawn balance of ($33,792.39).  In example 8, Exhibit 8 shows a settled deposit credited by the bank two days after a check was paid creating an initial overdraft of ($213,561.88) which turned into a positive bank balance two days after the deposit of $86,438.12.  As such, the illustrations fail to show deposits covered by artificial[ ] and contrived floats.  If anything, it shows only a consistent intent to ensure deposits covered checks.

(<u>Id.</u> at 11).

26

Synovus additionally asserts that "the Complaint fails to show any kited float was used to make the Repayments and Deposits," and that "the purported illustrations in the Complaint display events from January 2010 to April 2010, but the Complaint alleges the Repayments and Deposits occurred at a different time – from 2007 through 2011." (Doc. # 18 at 9).

In response to these arguments regarding the alleged kite, the Trustee submits that "whether the transfers involved kited funds is not dispositive." (Doc. # 25 at 25). That is, the Trustee maintains that "Mongelluzzi's intent is the critical issue." (Id.). As for Synovus's argument that the Trustee merely alleges examples of kites that occurred in January through April of 2010, the Trustee contends that "this argument ignores that Plaintiff's examples of kites are just that – *examples*. Plaintiff does not allege that kites *only* took place in 2010. Rather, Plaintiff clearly alleges that [Frank] Mongelluzzi and others perpetrated the scheme with the requisite intent from 2007 through 2010." (Id.).

The Court declines at this juncture to resolve any fact-based challenge to the Trustee's allegations. At this stage of the proceedings, the Trustee need not provide sufficient evidence to prove each claim asserted. The Court finds that

the Amended Complaint is sufficiently detailed to survive the present Motion to Dismiss. As explained above, the claims in Counts I, IV, and VII are premised upon the "actual intent to hinder, delay, or defraud any creditor of the debtor." Fla. Stat. § 726.105(1)(a). The Court determines that certain factual disputes regarding the logistics of the banking transactions involved and the intent of the relevant actors are not proper for resolution at this juncture. The parties will have an opportunity to frame their respective arguments as to the nature of the allegedly fraudulent banking activity at the summary judgment stage.

### iv. **Other Arguments**

Although Synovus alleges several additional arguments related to the kite allegations within Counts I, IV and VII, the Court finds that none of the arguments raised provide a basis for dismissal of the Amended Complaint under the Rule 12(b)(6) standard provided above. For instance, Synovus argues that (1) "a kite would injure a particular bank left without a settled deposit – not the alleged perpetrator of the kite – here [Frank] Mongelluzzi;" (2) "if the Trustee had alleged an injured bank and further showed [Frank] Mongelluzzi made the Repayments and Deposits to injure that bank, any recovery by the Trustee would be limited to the

value of the kited check deposits to that bank or an amount
to cover the injured bank, whichever is less;" and (3) "if a
kite established fraudulent intent, every creditor of [Frank]
Mongelluzzi who received a payment from him from 2007 – 2011
would be exposed to a suit for fraudulent transfer." However,
the Court finds none of these contentions warrants dismissal
of the Amended Complaint at this time.

Such policy arguments, attempts at hypothetically re-
framing the Amended Complaint's allegations, and arguments
regarding limitations on damages do not constitute grounds
for granting a Rule 12(b)(6) Motion.  The Amended Complaint
has provided Synovus with ample awareness of the claims
against it so that Synovus may frame a responsive pleading.
Synovus may reassert these arguments, if appropriate, at the
summary judgment stage.

### b.   Synovus's Action and Inaction

Synovus next asserts in the Motion to Dismiss that it
"does not owe the duties alleged in the Complaint to private
litigants like the Trustee."  (Doc. # 18 at 12).  In so
arguing, Synovus refers to the Trustee's allegations that
Synovus "had duties to exercise due diligence, to monitor, to
detect and to terminate 'check kiting, money laundering and
other illicit banking activities.'"  (Id. at 12 n.4) (citing

Doc. # 17 at ¶ 16).  Synovus maintains that "[e]ven if Synovus owed a duty under these circumstances, it would only be a duty to the government (for which the Trustee has no standing)." (Id. at 12).

Synovus also challenges the Trustee's criticism that "Synovus did not immediately halt its banking relationship, but instead implemented a controlled exit strategy to obtain repayment and secure future revenue." (Id. at 13).  Synovus maintains, however, that "it is normal for a bank to attempt a workout with a distressed debtor.  That shows no ill-intent of [Frank] Mongelluzzi as to the Repayments and Deposits." (Id.).  Synovus observes that "[l]ater, the Trustee does a '180' by complaining Synovus in fact did take actions in view of an overdraft of $15,000,000.  Thus, on the one hand the Trustee complains Synovus took no actions [ ], but then complains Synovus took actions . . . ." (Id.).

Synovus concludes its challenge to Counts I, IV, and VII by asserting that the "Trustee alleges in conclusory fashion [Frank] Mongelluzzi intended to defraud his creditors by making the Repayments and Deposits," and arguing that many allegations within the Amended Complaint either "stand bare . . . without factual support" or fail to relate to the 2007- 2011 time period. (Id. at 14).

Although Synovus classifies questions relating to its duties of due diligence and monitoring as questions relating to the Trustee's "standing" to bring this claim (Doc. # 18 at 12), the Court disagrees.  Notably, none of the cases provided by Synovus to support this contention hold that a Trustee lacks standing in a fraudulent transfer action because the defendant bank owes a certain duty of care to the government rather than third parties.  Rather, the Court considers questions relating to Synovus's action or inaction regarding the transfers at issue to constitute considerations in determining whether Synovus acted in good faith – a defense which Synovus concedes is "not in play at this time." (Doc. # 29 at 1-2).  Because the Court finds each of Synovus's arguments relating to Counts I, IV, and VII insufficient to warrant dismissal at this stage of the proceedings, the Court denies Synovus's Motion as to these Counts.

### 2.   Counts II, III, V, VI, VIII and IX

In Counts II, III, V, VI, VIII, and IX, the Trustee asserts claims for constructive fraud pursuant to Sections 726.105(1)(b) and 726.106(1),[6] Florida Statutes.  (See Doc.

---

[6] Section 726.106(1), Florida Statutes, provides:

> A transfer made or obligation incurred by a debtor
> is fraudulent as to a creditor whose claim arose

# 17 at 3-4).   Synovus's argument for dismissal of these
Counts is brief.   According to Synovus,

> [t]he first element necessary for both types of
> constructive fraud claims is a failure to exchange
> reasonably equivalent value for a transfer.  Fla.
> Stat. §§ 726.105(1)(b)[,] 726.106(1).   Value is
> given for a transfer when property is transferred
> or an antecedent debt is satisfied.  Fla. Stat. §
> 726.104(1).  The Trustee does not allege any fact
> suggestive that satisfaction or credit was not
> extended by Synovus upon its receipt of Repayments
> and Deposits.  In addition, . . . loan repayments
> and deposits cannot be fraudulent transfers.

(Doc. # 18 at 14).

However, the Trustee reasons that "Defendant wants the
Court to ignore Plaintiff's allegations that Defendant did
not give reasonably equivalent value and accept Defendant's
unsworn and unsupported assertion to the contrary as truth."
(Doc. # 25 at 27).  The Trustee contends that dismissal would
be particularly inappropriate in the context of "allegations
of value, because it 'has long been established that whether
fair consideration has been given for a transfer is largely

---

before the transfer was made or the obligation was
incurred if the debtor made the transfer or
incurred the obligation without receiving a
reasonably equivalent value in exchange for the
transfer or obligation and the debtor was insolvent
at that time or the debtor became insolvent as a
result of the transfer or obligation.

a question of fact.'" (Id. at 27-28)(citing In re TOUSA, Inc., 680 F.3d 1298, 1311 (11th Cir. 2012)).

The Court agrees and finds that the question of whether Synovus failed to exchange reasonably equivalent value for the relevant transfers in this case constitutes an issue to be resolved after the close of discovery in this matter. For the purpose of resolving the present Motion, the Trustee has indeed alleged that the transfers at issue were made to Synovus "for less than reasonably equivalent value in exchange for such transfers." (Doc. # 17 at ¶¶ 85, 90, 100, 105, 115, 120). In the context of the Trustee's comprehensive Amended Complaint, the Court finds the Trustee's allegations as to the exchange of reasonably equivalent value sufficient to survive the present Motion to Dismiss. Once again, Synovus may raise this argument at the summary judgment stage when the Court has the benefit of reviewing the parties' evidentiary support for their respective positions.

### 3.   Counts X, XI and XII

Finally, Synovus addresses the Trustee's fraudulent transfer claims in Counts X, XI and XII. The Trustee brings Count X for actual fraud pursuant to Fla. Stat. § 726.105(1)(a), Count XI for constructive fraud pursuant to Fla. Stat. § 726.105(1)(b), and Count XII for constructive

fraud pursuant to Fla. Stat. 726.106(1).  (See Doc. # 17 at 4).  Each of these Counts relates to the Able Body Labor Sale Transfers.

### a.   Standing

Synovus first argues that "as a matter of law, the Trustee has no standing to sue for the Able Body Labor Businesses' sale of assets."  (Doc. # 18 at 15).  Synovus reasons that, "[u]nder Florida law, [Frank] Mongelluzzi's ownership interests in the Able Body Labor Businesses are distinct from the assets of [the] Able Body Labor Businesses," and thus that "when the Able Body Labor Businesses transferred their assets, the transfers were not transfers of [Frank] Mongelluzzi's property, and they cannot be recovered by the Trustee."  (Id. at 16).

However, the Trustee responds that the Amended Complaint alleges "that the Mongelluzzis owned and operated the Able Body Labor Businesses, that those businesses generated substantial revenue, and that the Defendant orchestrated and exerted substantial pressure on the Mongelluzzis in connection with the sale of the assets of those businesses to MDT and Traina as part of its controlled exit strategy to obtain repayment of outstanding obligations 'regardless of the source.'"  (Doc. # 25 at 28) (quoting Doc. # 17 at ¶¶ 7-

9, 35(b), 38, 44-62).  The Trustee further argues that Synovus "ignores the fact that [Frank] Mongelluzzi's stock, financial and other entitlements vis-à-vis the Able Body Labor Businesses constituted an 'interest of the debtor in property' within the meaning of the fraudulent transfer provisions and that Plaintiff has standing to avoid and to recover transfers of such interests." (Doc. # 25 at 28-29).

In asserting the existence of standing, the Trustee cites In re IFS Fin. Corp., 669 F.3d 255 (5th Cir. 2012), which, in a case of first impression, analyzed the question of whether legal ownership is required to show that a debtor may own the contents of non-debtor bank accounts such that they form part of the debtor's bankruptcy estate.  Id. at 262.  The Fifth Circuit reasoned:

> The scant case law within our grasp shows that in answering this question on appeal, control is more decisive than ownership.  Guided by these principles, we hold that control may be sufficient to show ownership in what is ultimately a fact-based inquiry that will vary according to the peculiar circumstances of each case.

Id.

Synovus characterizes the holding of IFS to extend standing to a Trustee only "where a debtor corporation, with a corporate structure to 'mask' activities and 'commingle' funds . . . had de facto ownership of non-affiliated entites,"

35

and argues that the Trustee "make[s] no claim of what would amount to substantive consolidation." (Doc. # 29 at 5). However, Synovus provides no authority mandating that the Trustee include such allegations in order to state a claim based on a debtor's interest in certain property transferred. As noted above, the Trustee has alleged ample facts to support its claim that Frank Mongelluzzi had control over the assets of the Able Body Labor Businesses such as might constitute an interest in the property transferred to Synovus. At this early stage of the litigation, the Court declines to inquire into the extent to which Frank Mongelluzzi may have an interest in the assets of the Able Body Labor Businesses or the asset sale transfer. These issues, like all the issues raised thus far, are appropriate for resolution on summary judgment, but not at this early stage of the proceedings.

**b.    Fraud and Fraudulent Intent**

Synovus further argues that Counts X, XI and XII of the Amended Complaint fail to state a claim because "in general the Complaint fails to allege facts of an actual fraudulent intent of [Frank] Mongelluzzi and likewise with regard to the sale of assets the Complaint fails to allege any facts relevant to [Frank] Mongelluzzi's intent." (Doc. # 18 at 17). Synovus reasons that "[i]f anything the Complaint shows

the transfer was made for fair value because the Complaint alleges a sale price in August of 2010 of up to $55,000,000 and a sale in early 2013 to a different company for over $48,000,000." (Id.).

Additionally, Synovus claims that the Amended Complaint "fails to show constructive fraud in the transfer of the Able Body Labor Businesses' assets" because "the first requirement of a constructive fraud claim is lack of an exchange of reasonably equivalent value." (Id. at 17). Rather than demonstrating a lack of exchange for reasonably equivalent value, Synovus argues that the Amended Complaint instead "shows two different sales at different times of similar values." (Id.).

As previously stated, the Court finds that the issues of intent in this case, as well as questions relating to the exchange of reasonably equivalent value, are not properly resolved on a motion to dismiss. The Trustee has adequately pled these claims, and Synovus is free to provide support disputing the claims after the parties have had the opportunity to conduct discovery.

Synovus also claims that "the [Amended] Complaint fails to show Synovus was a transferee of the assets," and that the Amended Complaint instead "affirmatively shows the transferee

was MDT/Michael Traina and subsequently True Blue, Inc." (Id. at 18).  Synovus maintains that "Florida law does not permit liability against Synovus . . . for its alleged participation in the negotiations of the sale." (Id.).

The Trustee reasons, however, that "Plaintiff may recover a fraudulent transfer directly from the person for whose benefit the transfer was made." (Id. at 29) (quoting Fla. Stat. § 726.109(2)(a); 11 U.S.C. § 550(a)(1)).  The Trustee maintains that Synovus is "the entity for whose benefit the transfer was made because it was the sole party that received any consideration from the transaction." (Id.).

The Trustee indeed alleged within the Amended Complaint that the sale of the Able Body Labor Businesses' Assets constituted a transfer of Frank Mongelluzzi's interest in property "for the benefit of Synovus as the only party which received the purchase price consideration totaling approximately $42 million from the transaction." (Doc. # 17 at ¶ 60).  The Court finds this allegation sufficient to survive Synovus's Rule 12(b)(6) Motion on this issue.

Accordingly, Synovus's Motion is denied as to Counts X, XI, and XII.

**III.  Rule 12(b)(7)**

Finally, Synovus argues that, with respect to Counts X, XI and XII, the Amended Complaint fails to join necessary parties.  Because Synovus contends that the Able Body Asset Transfers were not transfers of Frank Mongelluzzi's interest in property, "but were transfers of the Able Body Labor Businesses' property," Synovus maintains that "Christine L. Herendeen, the chapter 7 trustee of the Able Body Labor Businesses, and MDT/Traina are necessary parties to those claims." (Doc. # 18 at 18).

### A.   Legal Standard

Federal Rule of Civil Procedure 12(b)(7) provides that a party may assert by motion the defense of "failure to join a party under Rule 19." Fed. R. Civ. P. 12(b)(7).  Rule 19 provides, in relevant part:

(a) Persons Required to be Joined if Feasible

> (1)   Required Party.  A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

>> (A)   in that person's absence, the court cannot accord complete relief among the parties; or

>> (B)   that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

> > (i) as a practical matter impair or impede the person's ability to protect the interest; or
>
> > (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.
>
> > (2) Joinder by Court Order. If a person has not been joined as required, the court must order that the person be made a party. A person who refuses to join as a plaintiff may be made either a defendant or, in a proper case, an involuntary plaintiff.

Fed. R. Civ. P. 19(a).

In ascertaining under Rule 19(a) whether a person is one who should be joined if feasible, "pragmatic concerns, including the effect on the parties and the litigation, control." Selelyo v. Sararo, No. 2:09-cv-261-FtM-36DNF, 2011 WL 3235948, at *5 (M.D. Fla. July 28, 2011). "The burden is on the movant to show the nature of the unprotected interests of the absent parties." Id.

If the Court determines that a person should be joined under Rule 19(a), "but for some reason cannot be, the court must analyze the factors outlined in Rule 19(b) to determine whether 'in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person thus regarded as indispensable.'" Laker

Airways, Inc. v. British Airways, PLC, 182 F.3d 843, 847 (11th
Cir. 1999) (quoting Fed. R. Civ. P. 19(b)).

   **B.   Discussion**

   Synovus argues that "Trustee Herendeen claims an
interest in the subject of the action because the transfers
the Trustee seeks to avoid were transfers of property
belonging to the Able Body Labor Businesses," and that
disposing of this action in her absence "would subject Synovus
to [a] substantial risk of multiple, inconsistent obligations
for the same alleged fraudulent transfer." (Doc. # 18 at
19). Furthermore, Synovus claims that MDT/Traina is a
necessary party "because the Trustee alleges MDT/Traina was
the recipient of the fraudulent[ly] transferred assets. As
a practical matter, disposing of this action would impair or
impede MDT's ability to protect its interest in the Asset
Purchase Agreement." (Id.). Synovus emphasizes that it would
"suffer[ ] a substantial risk of incurring multiple or
otherwise inconsistent obligations if the Trustee obtains a
judgment against Synovus for assets that were alleged to be
fraudulently transferred to MDT/Traina," and additionally
posits that "MDT/Traina is necessary for the Court [to]
determine what percentage of responsibility, if any, MDT and
Synovus share." (Id.). Finally, Synovus states generally

that "both MDT/Traina and Ms. Herendeen are needed to afford complete relief among the existing parties."  (Id.).

In response, the Trustee argues that Synovus's "assertion that this action might affect MDT's rights in the purchase agreement in some vague, unidentified way falls far short of satisfying Defendant's burden of showing that MDT or Traina are necessary parties."  (Doc. # 25 at 30).  The Trustee further reasons that "'[a] party is not indispensable simply because it may be affected by the outcome of the case.'"  (Id.) (quoting United States v. Angulo, No. 8:12-cv-1379-JSM-EAJ, 2012 WL 6009338, at *4 (M.D. Fla. Dec. 3, 2012)).  The Trustee insists that recovery is appropriate against Synovus directly "as the entity for whose benefit the transfer was made," and that there is no "shared" liability among MDT and Synovus to be determined.  (Doc. # 25 at 31).

As for the possibility that Trustee Hendereen may potentially bring a separate action against Synovus based on the transfers at issue, the Trustee argues that "this argument fails to recognize that 'inconsistent obligations' under Rule 19 are distinct from inconsistent results."  (Id.).

The Court finds that MDT, Traina, and Trustee Hendereen are not necessary under Rule 19(a).  "The absence or presence of [these parties] in this lawsuit has no bearing on the

Court's ability to accord complete relief among those already parties." In re Fin. Federated Title & Trust, Inc., 252 B.R. 840, 843 (Bankr. S.D. Fla. Sept. 13, 2000). The Court can afford the Trustee the relief she seeks because Synovus "can be found liable as the direct, mediate, or immediate transferee of a fraudulent transfer, and [it] can be ordered to turn over the estate property and/or account for same." Id. Although the circumstances surrounding the transfers allegedly involve MDT, Traina, and the Able Body Labor Businesses, these entities need not be joined as parties in this lawsuit in order to establish the relationship among these entities or the facts involved in the transfers.

Furthermore, to address Synovus's argument that "to avoid the alleged fraudulent transfer effectuated by the Asset Purchase Agreement, the Court must join all parties to the agreement," (Doc. # 18 at 20), the Court agrees with the Trustee's explanation that "a fraudulent transfer action is not a contract action, even if it seeks to avoid a transfer that occurred pursuant to a contract" (Doc. # 25 at 32). Thus, because the Court finds that neither MDT, Traina, nor Trustee Herendeen are "necessary parties" to this litigation under Rule 19(a), the Court need not proceed to the analysis contained in Rule 19(b).

Additionally, an analysis guided by Rule 19(b) is unnecessary here for a more simple reason. Curiously, although Synovus invokes Rule 12(b)(7) in challenging the Trustee's failure to join necessary parties, Synovus does not argue within the Motion to Dismiss that the Trustee's failure to join the relevant parties constitutes grounds for dismissal of Counts X, XI, and XII. Instead, Synovus merely argues that the relevant parties are necessary to resolve those claims. In bringing a motion under Rule 12(b)(7), Synovus bears the burden of "demonstrat[ing] which Rule 19(b) factors require[ ] dismissal 'in equity and good conscience.'" Molinos Valle del Cibao, C. por A. v. Lama, 633 F.3d 1330, 1347 (11th Cir. 2011); see also Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1280 (11th Cir. 2003) ("However, [the moving party] has identified no reason why [the absent party] cannot be joined in this action [thus requiring dismissal under Rule 19(b)].""). Accordingly, the Court need not reach the question as to whether MDT, Traina, or Trustee Hendereen constitute indispensable or merely necessary parties under Rule 19(b), because Synovus has failed to identify any reason why they could not be joined.

44

Therefore, to the extent Synovus asserts the present Motion to Dismiss pursuant to Rules 12(b)(7) and Rule 19, the Motion to Dismiss is denied.

Accordingly, it is

**ORDERED**, **ADJUDGED**, and **DECREED**:

(1) Defendant Synovus Bank's Motion to Dismiss Complaint (Doc. # 18) is **DENIED**.

(2) Defendant Synovus Bank is directed to file an answer to the Amended Complaint on or before July 11, 2014.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>25th</u> day of June, 2014.

VIRGINIA M. HERNANDEZ COVINGTON<br>
UNITED STATES DISTRICT JUDGE

Copies: All Counsel of Record

45